1          IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    _____

     JUSTIN BELL, ET AL.,
4
                              PLAINTIFFS
5
                VS.                    CIVIL ACTION NO. 10-320
6
     CITIZENS FINANCIAL GROUP, INC.,
7    ET AL.,
                              DEFENDANT
8    _____

9

10                           PROCEEDINGS

11        Transcript of PRETRIAL CONFERENCE, commencing on FRIDAY,
     DECEMBER 14, 2012, AT 3:00 P.M., in the United States District
12   Court, Third Floor, U. S. Post Office and Courthouse Building,
     Pittsburgh, Pennsylvania, before the HONORABLE GARY L.
13   LANCASTER, UNITED STATES CHIEF DISTRICT COURT JUDGE.

14

15   APPEARANCES:

16   For the Plaintiff:  By:  Brendan Donelon, Esquire
                               Donelon, P.C.
17                             420 Nichols Road, Suite 200
                               Kansas City, Missouri  64112
18

19                             Peter Winebrake, Esquire
                               Andrew Santillo, Esquire
20                             Winebrake & Santillo
                               715 Twining Road, Suite 211
21                             Dresher, Pennsylvania  19025

22                             Daniel Craig, Esquire
                               Law Office of Donelon, P.C.
23                             802 Broadway, Seventh Floor
                               Kansas City, Missouri  64105
24

25

1   APPEARANCES:   (CONTINUED)

2   For the Defendant:   By:   Mark Batten, Esquire
                               Alison Langlais, Esquire
3                              One International Place
                               Boston, Massachusetts   02110
4

5                              Elise Bloom, Esquire
                               Brian Gershengorn, Esquire
6                              Proskauer Rose
                               Eleven Times Square
7                              New York, New York   10036-8299

8   Reported by:               Sandra Wenger, FCRR, CM
                               Official Court Reporter
9                              Fifth Floor, U.S. Courthouse
                               Pittsburgh, Pennsylvania 15219
10                             412.261.6254

11  Proceedings recorded by mechanical stenography.   Transcript
    produced by computer-aided transcription.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          FRIDAY AFTERNOON SESSION, DECEMBER 14, 2012, 1:30 P.M.

2                              - - -

3                     P R O C E E D I N G S

4                              - - -

5               (Whereupon, the following in-chambers conference was

6     had.)

7               THE COURT:  Good afternoon.  Have a seat.

8     Apparently, no one told you about casual Friday.  Missed the

9     memo.  Okay.  Who are you, who do you represent, and where are

10    you from?

11              MR. DONELON:  Brendan Donelon, plaintiff.  Kansas

12    City, Missouri.

13              MR. WINEBRAKE:  Pete Winebrake, from Dresher,

14    Pennsylvania, which is outside Philadelphia, for the

15    plaintiffs.

16              MR. SANTILLO:  Andy Santillo, also from Dresher.

17              MR. CRAIG:  Daniel Craig.  I work with Brendan

18    Donelin, Kansas City, Missouri.  Plaintiffs.

19              MR. BATTEN:  Mark Batten, Your Honor, from Boston,

20    for the defendants.

21              MS. BLOOM:  Elise Bloom, from New York, for

22    defendant.

23              MR. GERSHENGORN:  Brian Gershengorn, from New York,

24    for defendant.

25              MS. LANGLAIS:  Alison Langlais, Boston, for the

1    defendants.

2            THE COURT:   Okay.   We have three of the best

3    football teams in the room and one of them works.   Don't have

4    to point fingers.

5            MR. DONELON:   Try figure that one out on your own.

6            THE COURT:   I want to know who you are.   And the

7    only time the Steelers get to the Super Bowl is if we don't

8    have to play New England.

9            MR. BATTEN:   Hope you won't hold that against me,

10   Judge.

11           THE COURT:   No.   All you have to do is lose a game

12   in this case.

13           MR. BATTEN:   I thought the Texans were going to take

14   us out of it.

15           THE COURT:   Well, the Steelers are on a bad slide

16   here.

17           MR. BATTEN:   Everyone's hurt.

18           THE COURT:   I guess we've had all the discovery

19   that's going to be taken has been taken; right?

20           MR. DONELON:   Correct.

21           MR. BATTEN:   Yes.

22           THE COURT:   Do you have an expert?

23           MR. BATTEN:   We do.

24           THE COURT:   Economist of some sort?

25           MR. BATTEN:   I mean, the liability part of her

1    testimony is to talk about the difference in pay between the

2    plaintiff class and other employees.  That's all she's going

3    to talk about, because that goes to whether they were exempt

4    or not, if there was enough of a difference in their salary.

5    There's a few calculations associated with that.  That's why

6    we have an expert.  But she'll be brief.

7                 THE COURT:  You object to that, I guess?

8                 MR. DONELON:  It's one methodology.  It was

9    something that we addressed in a motion in limine.  I'm not

10   exactly -- I'm not sure what methodology she follows in her

11   expert report.  We had submitted and Judge Conti just issued

12   an opinion about some mathematical formula used to compare the

13   two.

14                MR. BATTEN:  Which we don't object to.

15                MR. DONELON:  Then we have an expert.  And I don't

16   think the parties are necessarily in disagreement on

17   bifurcating liability and damages.  Our expert would be

18   testifying, if liability's found against the defendants,

19   regarding just class damages.

20                MS. BLOOM:  Our expert is on both.

21                THE COURT:  On damages and liability?

22                MR. BATTEN:  Yes.  Right.

23                THE COURT:  Let's go through some of these.  See if

24   we can reach some agreement.

25                Now, some of the questions you've presented in the

1   pretrial statements, plaintiffs must submit Citizens

2   employees, Pete Camilleri, Jacqueline Courtwright, and Lisa

3   McGraw.  Are they your employees?

4            MR. BATTEN:  Ms. Courtwright is no longer with the

5   defendant.  The other two are current employees of the

6   defendant, but they are in New York and Chicago.

7   Mr. Camilleri is in Chicago.  Ms. McGraw is in New York.

8            THE COURT:  You want to make them, subpoena these

9   people or produce them?

10            MR. DONELON:  They're the employees of the

11   defendant, not the plaintiff.

12            THE COURT:  I'm sorry.  I got them backward.

13            Do you want them to subpoena them or?

14            MR. BATTEN:  They can't subpoena them because

15   they're too far away.  I think both of them are likely going

16   to testify in our case.  The plaintiffs are free to examine

17   them and then we would.

18            THE COURT:  So, kind of a moot issue here.

19            MR. BATTEN:  I don't know what the plaintiffs would

20   say to that.  We haven't --

21            MR. DONELON:  We don't think it's a moot issue.

22   First off, we think that they can be subpoenaed.  We've done

23   some research and there is this issue as to whether or not you

24   can subpoena somebody outside the hundred-mile radius.

25            There's another part of the federal rules that talk

1   about subpoenaing parties or the parties' officers outside

2   that hundred-mile range, at least the research we've done, and

3   we've found the majority of the Courts state that if it's a

4   party, party officer, they can be subpoenaed for trial outside

5   the hundred-mile radius.

6        These three people appear under 30(b)(6) notice of

7   deposition.  So, they all appear in the corporation's behalf,

8   these depositions, for the topics covering them.

9        So, that's what we want to examine them on.  Our

10  position is they're all actually parties.  Now, one of them

11  is a former employee.  First time we found out that

12  Courtwright was a former employee is when we got their

13  pretrial statement. That was one of the legal issues that was

14  raised, which is whether or not we have to subpoena a former

15  employee Courtwright.  Our position is that when she gave the

16  deposition testimony, she was the company.  She's remaining

17  with the company.  We think we can subpoena all three of them.

18  Only Ms. Courtwright, if there is an unwillingness to do that,

19  we'll subpoena them.  Call them in our case in chief.  Take a

20  trial deposition on video tape.

21        THE COURT:  Why don't do you this.  Why don't you

22  decide if you're going to call them in your case.

23        MR. BATTEN:  Yes.

24        THE COURT:  If you are going to call them in your

25  case, we don't need to go through any of this.  We can make

1   some agreement.  They can take her out of turn.  We don't have
2   come back and forth.
3          MR. BATTEN:  That is our principle concern, twice,
4   separated by a couple weeks.
5          THE COURT:  Matter to you?
6          MR. DONELON:  That would be fine with us.  I think
7   the only one is Courtwright.
8          MR. BATTEN:  She's a former employee.  We don't
9   control her, anymore.  She lives in Albany, I think.  So,
10  whether she's going to be able to attend or not, as of this
11  moment, I just don't know, Your Honor.
12         THE COURT:  Find out within the next ten days and
13  let them know what you're going to do.  You'll know.
14         MR. WINEBRAKE:  Your Honor, can I just ask a
15  question?  What the Court is contemplating, though, is we
16  would get to call them.  They would testify during our case.
17  Just so the scope of their testimony could include that they
18  were getting called by the defendants.
19         THE COURT:  Yes.  We tell the jury all the time,
20  for scheduling reasons, sometimes witnesses are called out of
21  turn.  Then you would have a chance to examine them on what
22  you wanted them to say and then we'll go back on schedule
23  here.  This is not an uncommon experience; okay?
24         Whether the propriety of a three-year limitation is
25  a jury question.  I'm not sure.  My understanding from your

1   complaint, all your plaintiffs come within the two years.

2            MR. DONELON:   There's some part of the putative

3   class -- some plaintiffs limited to two years and there's

4   going to be some class members who aren't going to have a

5   claim for damages.

6            THE COURT:   I thought your complaint itself said

7   everybody came within two years.

8            MR. DONELON:   Yes.   That's, I guess, also the ones

9   who are class members within, who would also be allowed to

10   collect three years.   Question under the law is whether there

11   was a willful violation.   I don't think, at least either

12   side's jury instructions, I think we both put it in there for

13   the jury to decide whether --

14            MR. BATTEN:   We agree.

15            MS. BLOOM:   But it would go on bifurcation to the

16   second, if there were liability.

17            MR. DONELON:   Right.   Actually, they would decide

18   the first part of the case, whether they were liable for over-

19   time, and, B, when it was a violation, because we put on

20   damages and we don't know whether or not we have evidence for

21   two years or for --

22            THE COURT:   So, you're going to have some members of

23   your class who might win on liability and get no money.

24            MR. DONELON:   That's correct.   It's possible.   If

25   the jury finds it wasn't a willful violation; correct.

1            THE COURT:  Okay.  I think it is a jury question.

2            So, all right.  Now, let's go over some of these

3    motions in limine.  Some of the other stuff, we might be able

4    to answer these today.  Maybe not.

5            Plaintiffs have filed a motion to exclude evidence

6    of any employee benefit, including health insurance, other

7    insurance, retirement benefits, outside of the salary and

8    bonuses.

9            MR. BATTEN:  There is no opposition to that, Your

10   Honor.

11           MR. DONELON:  I said it was okay.  Yes.  Bonus is

12   fair game.

13           MR. BATTEN:  We're only talking about insurance

14   benefits.  Basically, we don't intend to present any evidence

15   about that.  So, there is no opposition.

16           THE COURT:  Plaintiffs want to exclude evidence of

17   ABMs not making internal complaints to defendant about not

18   being paid overtime.  You intend on introducing evidence about

19   them not making internal complaints?

20           MS. BLOOM:  Yes, Your Honor.  We do.  We intend to

21   introduce evidence as to them not making internal complaints.

22   It's our position, and I do believe there is a Seventh

23   Circuit, not Third Circuit, but Seventh Circuit case that

24   addresses this issue which holds that whether or not they

25   asserted an internal complaint at the time that they were

1  functioning as an ABM is an indicia, whether they considered
2  that the duties that they were performing were managerial or
3  not managerial.

4          One of the concerns that the plaintiffs have raised
5  is that the jury might be confused and might think that that
6  was a waiver of their claims in this case.  But that can be
7  cured through an instruction.

8          And so, we believe under, it's Moylan versus Meadow
9  Club.  Case cite, 979 Fed. Second 1246, that the evidence as
10 to whether or not they filed an internal complaint should come
11 in.  It appears, again, an indicia of whether or not they
12 considered themselves to be performing managerial or non-
13 managerial functioning.

14         It's significant for the assistant branch manager
15 as one of their jobs was making sure that the hourly worker
16 properly recorded their time.  So, certainly, that made them
17 aware of fact that hourly workers had to record their time in
18 order to be paid overtime.

19         As to whether an assistant branch manager raised a
20 complaint would, at least the jury could evaluate whether that
21 person was being credible, the assistant branch manager, where
22 they testified if they had, that they believed they were
23 performing non- or primarily non-managerial functions.  As I
24 said, you know, any confusion could certainly be dealt with
25 through a jury instruction.

1          MR. DONELON:  The entire body of case law out there,

2     I haven't had chance to look in detail what she's referenced,

3     but I'm sure your law clerk will have all the statutes

4     completely what's relevant under Fair Labor Standard Act,

5     whether the person making a claim for loss of overtime made a

6     complaint internally or not is a prerequisite to getting

7     damages or remedies under the law.  It's not their requirement

8     under the law to make sure what they're doing allows them to

9     get paid overtime or not.  It's the employer's burden.  I

10    mean, the large body of case law says the exact opposite.

11         THE COURT:  I will hold off on that one.  Everybody

12    agrees, however, that it's not an administrative prerequisite

13    to file a claim?

14         MS. BLOOM:  Right.  That's why I said, Your Honor,

15    that could certainly be addressed in a jury charge.  But there

16    is authority and we have cited authority to the proposition

17    that it is a factor that the jury could consider in evaluating

18    the credibility of an assistant branch manager that testifies

19    that he or she did not believe that they were performing

20    managerial functioning.

21         THE COURT:  Okay.  The plaintiffs want to exclude

22    evidence from any Citizens branch manager of any knowledge

23    they have of ABMs who did not opt into the case.

24         You plan on introducing evidence?

25         MR. BATTEN:  Yes, Your Honor.  On this one, that

1   Your Honor, raises, is connected with motions both that the

2   plaintiffs have filed and we have filed.   There is a whole

3   cluster of motions back and forth about sort of the scope of

4   witnesses at trial.

5           What the plaintiffs want to say is we are going to

6   cherry-pick fifteen people out of this class.   They're going

7   to come and testify about their own experience. And the only

8   evidence that should come in at all is something related to

9   one of those fifteen people.

10          What we say is, and Your Honor has already held in

11  denying the motion for de-cert, that they can proceed by way

12  of representative evidence.   That's fine.   That's the law of

13  the case.   We accept that.   The question is, is the evidence

14  that they're going to present representative.

15          And that, to us, is an absolute question of fact.

16  The jury's going be asked to make an inference of their

17  fifteen people as to the work situations of the other four

18  hundred seventy-some people.   That kind of an inference from

19  the facts is a question of fact and we want to be --

20          THE COURT:   That kind of inference from the facts is

21  a question of fact.   That's a heck of sentence.

22          MR. BATTEN:   Let me try again with that one.   It's

23  not a legal issue.   It's a factual question whether the

24  testimony that they present from fifteen is representative of

25  the four hundred seventy.   They don't cite a single case,

1  we're not aware of one, where a Judge has said I'm going to

2  decide that factual question before trial.

3          So, yes.  We want to be able to present --

4          THE COURT:  You want to bring in some other people

5  who are not opt-in people to say, hey, I didn't do anything

6  they're talking about.

7          MR. BATTEN:  I managed.  That's the way the branch

8  manager treated me.

9          THE COURT:  You can bring them in.

10         MR. BATTEN:  Thank you.

11         MR. DONELON:  Your Honor, can I have an opportunity?

12         THE COURT:  Sure.  Go right ahead.

13         MR. DONELON:  When you decided that this case was to

14 proceed as a collective class action -- at the time the case

15 was really clear.  The only relevant evidence the Court could

16 look at was evidence from the, from the collective class,

17 collective class composed of people who opted into the case

18 and joined the case.  What they did at work is the only thing

19 that's relevant.

20         If they're allowed to bring in people who are not

21 class members, I know that I have to prove people who are not

22 class members were improperly classified.  That just doesn't

23 make any sense in the case.

24         Also, it's not my position, what I am saying to you

25 right now, that they're not relevant, that's their position.

1    In all of their discovery responses they said the only thing

2    relevant in what we're going to produce is evidence dealing

3    with the plaintiffs and opt-in plaintiffs because that's the

4    only thing relevant to this class claim.   We didn't disagree

5    because that's a correct statement.   More importantly, Judge,

6    in their Rule 26 disclosures, they have to set forth everybody

7    who they plan on using to assert their defense.   That means

8    individuals were properly exempt.

9            In their Rule 26, which we relied upon in litigation

10   in this entire case, it said the only thing that's relevant

11   are the class members, the plaintiffs, the opt-in plaintiffs.

12   And the people that worked with those people, they didn't

13   provide any position or contact information.

14           THE COURT:   That's an argument for to you make to

15   jury.

16           MR. DONELON:   If they put --

17           THE COURT:   You can get up there and say, listen,

18   these aren't even plaintiffs.   They never claimed being non-

19   exempt.

20           MR. DONELON:   Great.   I can live with that.   The

21   other thing I need to point out, Your Honor, that is of some

22   concern, on their witness list are fifty-two, as an example,

23   fifty-two people who are assistant branch managers who are not

24   part of this case.   They've identified these are people they

25   intend to call to give testimony.   All of those people, the

1   only contact information is the name.  Says, if you want to

2   contact them, then contact our law office to do so.  We

3   represent all those people.  Now, all those people are

4   putative class members in the certified class action in the

5   State of New York or in the State of Pennsylvania.  Once those

6   cases became certified as a class action, we represent those

7   people.  They have not opted out of the case, yet.  Notice has

8   not been sent out, yet.  So, these people that  they want to

9   call are our clients.  They should not be communicating with

10  these people.  Period.  They tried this before in the Ross

11  case in Illinois.  We had the case certified as a class action

12  under Rule 23.  They appealed.  Discovery notice was stayed.

13  But those people, the class, became our clients.  When the

14  case got certified, what happens is they talked to some of

15  those people.

16          THE COURT:  Did you talk to some of these people and

17  try to get their claims settled outside of their attorney's

18  presence?

19          MR. BATTEN:  In this case?  No.  We did not.

20          MR. DONELON:  It's the exact same scenario in --

21  they're our clients.  We should be able to --

22          THE COURT:  I accept counsel's representation they

23  didn't do it.

24          MR. DONELON:  Well, I need to know about --

25          THE COURT:  He just said no.

1          MR. BATTEN:  We're not trying to settle anything.

2          THE COURT:  Did you talk to them?

3          MR. BATTEN:  We haven't spoken to them.

4          MR. DONELON:  Since the case got certified in New

5     York.  Make sure that's clear.

6          MR. BATTEN:  I don't know the whole list of people.

7     We have witnesses coming from different states.

8          MR. DONELON:  Handful from Massachusetts.

9          MR. BATTEN:  Well, I don't have that list in front

10    me.  We understand the issue, Your Honor.

11         MR. DONELON:  So, if we -- the interesting part is,

12    Judge, they can't -- for them to say we want to call them as a

13    witness, they're not class members in this case.  We represent

14    them as clients in another case.  They're outside the

15    hundred-mile radius to subpoena them to come to this case.

16    They're not clients of ours in this particular case.  They're

17    clients of ours in the New York case.  To get them to come to

18    testify at trial, I mean --

19         MR. BATTEN:  They're entitled to come testify if

20    they choose to come testify.  We're entitled to invite them to

21    come to Court.

22         THE COURT:  Just communicate to counsel, that's all.

23         MR. DONELON:  We'll get their contact information,

24    call them, and have a conference with them, whether they want

25    to testify or not.

1            THE COURT:  Yes.  All right.

2            Plaintiffs want to exclude evidence regarding any

3      prior actions, both civil and criminal.  What is this about,

4      now?

5            MR. DONELON:  We just know that some of our clients

6      in the depositions had had bankruptcies, maybe fifteen, ten,

7      fifteen years old.  This might be one of the ones you'll need

8      to know the morning of.

9            THE COURT:  Each morning we meet and you let me what

10     are the potential issues.

11           Do you plan on introducing any testimony about prior

12     legal actions of any of these plaintiffs witnesses?

13           MR. BATTEN:  There are a couple of instances, Your

14     Honor, where, first of all, the motion was about personal

15     family circumstances.  We are not going into any of that.

16     There are some witnesses who were convicted of crimes that go

17     to their credibility, that sort of thing.

18           So, in some of those specific instances, yes.  We

19     may want to explore criminal convictions or other sort of

20     fraudulent activity, those kinds of things, that might go to

21     their credibility.  Seems to me that's the kind of issue that

22     needs to be dealt with as testimony come in.

23           THE COURT:  There's limitations when you can use it.

24     You can ask the --

25           MR. DONELON:  As long as you give us a head's-up.

1  That's fine.  We can just address that.

2          THE COURT:  I'll defer.  Plaintiff wants to

3  introduce evidence of any individual ABM who did not -- we had

4  this already.

5          MR. BATTEN:  That is one of the others that was

6  associated with it.

7          THE COURT:  Evidence of any ABM not on either party

8  witness list or evidence suggesting the indication and not

9  proceed on a representative basis as irrelevant.  You intend

10 on arguing this case can proceed on a representative base.

11         MR. BATTEN:  Preserving the record with that point,

12 Your Honor.  You have already ruled that representative

13 evidence is an acceptable methodology.  We understand that's

14 law of the case.

15         THE COURT:  Denied.

16         MR. BATTEN:  Goes to the same point.

17         THE COURT:  Plaintiffs want to exclude evidence

18 regarding opt-in plaintiffs' personal family and financial

19 circumstances.

20         MR. BATTEN:  That's the one we were talking about.

21 To the extent we are talking about personal family

22 circumstances as opposed to --

23         THE COURT:  This is denied.

24         MR. BATTEN:  -- fraudulent convictions.

25         MR. DONELON:  Your Honor, that was plaintiff's

1  motion.

2              THE COURT:  That was plaintiff's motion.

3              MR. WINEBRAKE:  That's denied?

4              THE COURT:  It's unopposed.

5         Defendant wants to exclude plaintiff's expert

6  witness.  Are you asking for a Daubert hearing here?

7              MS. BLOOM:  Yes, Your Honor.  But we could,

8  probably, if you wanted to defer on that, if we're going to

9  bifurcate the case, since their expert only goes to the

10  questions of damages?  So, if you would prefer, we can wait

11  until it happens to see if there is a liability finding.

12              Essentially, there were two bases for our

13  application.  We did want to have that Daubert hearing.

14  Their expert report is truly expert testimony.  It's simple

15  math, also.

16              THE COURT:  All right.  Tell you what.  If there is,

17  if there is a liability finding, we'll have a Daubert hearing

18  on it.  Then, we'll do it at that time.

19              MR. DONELON:  Okay.  Both parties have briefed it

20  fairly extensively.

21              THE COURT:  Okay.

22              MR. DONELON:  So, the legal argument each side is

23  making, whether it should or should not get in, is

24  established.

25              MR. BATTEN:  Your Honor, individuals who may

1   represent, because just thinking about it, they may represent

2   these people in unrelated cases.  They don't represent those

3   individuals in this case.  So, if I don't speak to them about

4   those cases in which they are represented, I don't think I'm

5   barred from talking to them about this case.  Rule 4.2 says,

6   the ethical rule is, don't talk to people who are represented

7   by counsel in the matter.

8            THE COURT:  Yes.

9            MR. BATTEN:  Well, in that, I agree.  I can't talk

10  to them about the New York case, I can't talk to them about

11  the Massachusetts case, because they're represented by

12  counsel.  Those individuals who are on our list are not

13  represented by counsel in this action.  So, I don't know why

14  I couldn't speak to them about strictly for the purpose of

15  preparation for this case and testimony in this case where

16  they're unrepresented.

17           MS. BLOOM:  They elected to not opt-in.

18           MR. BATTEN:  They elected to not opt-in.

19           MR. DONELON:  They are -- it's the exact same claim,

20  though.  Exact same factual situation.  I found just a case,

21  I knew this issue would come up, and if the Court wants

22  further briefing I would be happy to do it.  It was actually a

23  case like this where there was a class action in State court

24  and there was a class action in federal court, both asserting

25  the same claims.  Getting ready to go to trial in federal

1  court.  The putative class members over here were certified,

2  were already represented by the same counsel.  Both making

3  same claims.  As long as it's the same material thing going

4  on, I mean, they want to go talk to them about what they did

5  as assistant branch manager in the Bell case and somehow the

6  claim that these are completely different than the assistant

7  branch managers in the New York case, they're making both

8  claims legally.

9          THE COURT:  All right.  For right now, the Court is

10 willing to stand on its ruling, but I'll look at it, though.

11         Defendants want to exclude evidence relating to

12 defendants' conduct during discovery.  What did you do during

13 discovery?

14         MS. BLOOM:  The reason for that motion was

15 precautionary, because in some of our conversations it's been

16 suggested that we didn't produce what we needed to produce.

17 And so, we just wanted to make sure that there wasn't going to

18 be any kind of comments made about what went on in the

19 discovery process.

20         MR. DONELON:  I mean, outside of that, Your Honor,

21 obviously, interrogatory answers were provided.  There were

22 admissions by the company.  Obviously, if we requested certain

23 documents with specific requests, they gave us a document

24 identifying all the documents to that request scope.  With

25 new documents, they have provided to us, without a Bates

1    stamp, we would take the issue up the Court, but --

2              THE COURT:  That's not what this is.

3              MR. DONELON:  As an example, we asked them to

4    provide us all of the documents showing these assistant branch

5    managers doing supervisory type duties, like writing people

6    up, doing performance reviews, counseling people, all the

7    things that supervisors do.  We wanted all the paperwork that

8    these people did showing that.

9              And we got fifteen pieces of paper for four hundred

10   seventy people.  They all dealt with one person who was

11   covering an branch manager.  He was an ABM.  So, I think it's

12   important that we have the ability to, if we put on this

13   trial, we call twenty witnesses and they have absolutely no

14   paperwork demonstrating these twenty witnesses doing any

15   supervisory work, I should be able to make that argument as a

16   closing.

17             THE COURT:  But that's not what this is.  They want

18   to exclude evidence relating to defendants' conduct during

19   discovery.

20             MR. DONELON:  I guess I'm just more confused about

21   is what their referring to.

22             THE COURT:  I assumed there was some dealings that

23   they did, something that was unethical.

24             MS. BLOOM:  It's just -- there's been -- yes.  There

25   was some statements made, not necessarily unethical, but some

1   statements about our discovery response.  I, out of an
2   abundance of caution, want to make sure that none of that
3   would be commented on in the trial.
4                    THE COURT:  Okay.
5                    MR. DONELON:  I don't recall it.
6                    THE COURT:  That's granted; yes.  Met and conferred
7   on these?
8                    MR. DONELON:  We did.
9                    MR. BATTEN:  I think both sides' position, they've
10  evolved since that.
11                   MR. DONELON:  We're not exactly sure what you have
12  to put in writing.
13                   THE COURT:  Defendants want to exclude evidence
14  regarding defendant's bad character.  Bad acts.  What bad acts
15  do you have?
16                   MS. BLOOM:  Same thing.  Just in case any comments
17  about, negative comments about the bank, any negative
18  comments, any legal proceedings about any of our witnesses.
19  Other than things that would be allowed under the federal
20  rules.
21                   MR. DONELON:  Make some negative comments about the
22  bank in closing dealing with wage and hour?  I'm not going to,
23  like I just said, for one hundred twenty-seven million dollars
24  inappropriately charging of overdrafts?  I'm not going to try
25  to delve into.  I don't have an issue, people arguing about

1  it.

2          THE COURT:   Okay.   Defendant's want to exclude

3  evidence of defendant's financial condition, net worth, and

4  compensation, paid to executives.

5          MS. BLOOM:   Yes, Your Honor.   Completely irrelevant

6  to the claims that are being asserted here.   This is not a

7  case where you've got punitive damages, which in any case

8  would be reserved for the damage phase of the case.   But the

9  claims don't have punitive damages that attach to them and any

10  statements about the bank's financial condition or about what

11  executives at the bank earnings would be irrelevant and highly

12  prejudicial.

13          MR. DONELON:   As long as there is no, woe is me

14  comment.   Like don't do this because it's going to cost this

15  much or cost people to lose --

16          THE COURT:   Anything along those lines.

17          MS. BLOOM:   Yes, we're not saying.

18          THE COURT:   That's granted.

19          Prohibit plaintiffs from offering representative

20  testimony regarding liability and damages or alternative to

21  offering statistically significant number of witness.

22          MR. BATTEN:   That is one Your Honor dealt with.

23          THE COURT:   Yes.

24          MR. DONELON:   Just, just for a clarification on

25  that.   There are four hundred seventy people who joined the

1   case.  We've picked put thirty on our witness list.  We don't

2   think, obviously, we're going to have enough time to call all

3   thirty.  We mentioned that in our pretrial statement.  They

4   were free to pick any of the class members they wanted to to

5   put on their witness list.  They picked, roughly, close to

6   thirty who were not our thirty.  So, they did find some of the

7   opt-in class members they wanted to call as witnesses.

8          So, whoever does get called as representative

9   testimony, it's not cherry-picking.  I'm only saying this

10  is -- they also did have the chance to cherry-pick whatever

11  opt-in class members they wanted to to put on testimony.  So,

12  I just wanted to make a clarification on that, however the

13  representative testimony gets put on, we're kind of hoping

14  before we leave here today we get some guidance from the Court

15  as to what the Court feels time-wise.

16          THE COURT:  We'll talk about that.

17          Defendants want to exclude evidence regarding fraud

18  and Project Park.

19          MS. BLOOM:  Project Park was a re-organization that

20  began in January of 2011 and was implemented in May of 2011.

21  The reason why I mention those dates is because the dates are

22  very significant.

23          Project Park was a re-organization where the company

24  looked at its work force and it looked at its banks.  There

25  are, basically, two kinds of Citizens banks.  There's the

1    bank, the more traditional kind you see on the street, the

2    stand-alone bank.  There's the bank that's the in-store

3    branch, the smaller bank.  Tends to operate seven days a week.

4            So, the company looked at its overall staffing and

5    determined that in some of its branches that its staffing

6    would be better served to have less or no assistant branch

7    managers and to have more either tellers or more bankers that

8    were engaging in, for example, selling-type activities.  So,

9    the company did a re-organization and, as a result of that,

10   some people that were assistant branch managers became either

11   bankers or tellers.

12           Why I mention the date and why I think the date is

13   very significant is because this case has nothing to do with

14   that recourse.  By the time that re-organization took place,

15   the opt-in period had closed and none of the people who have

16   opted into this case had opted in as a result of the

17   re-organization.

18           The plaintiffs want to offer testimony about the

19   re-organization because it's their position that that somehow

20   demonstrates that we believed that at the time prior to the

21   re-organization that the assistant branch managers were

22   performing non-exempt functions and that that's why we

23   re-organized, we re-organized to fix the problem that caused

24   this case.

25           It's our position that not only would any evidence

1    about this subsequent re-organization be irrelevant and it

2    would be irrelevant because the question at issue here is

3    whether at the time that the assistant branch managers, each

4    individual assistant branch manager, was performing his or her

5    job, whether that person was performing managerial functions.

6          Not only do we believe that this evidence of the

7    subsequent re-organization would be irrelevant, but we also

8    believe that it falls under Rule 407 and could be considered

9    like a subsequent remedial act.

10          In addition to that, and their own exhibit list

11    actually bears this out, if you were to allow this, what we

12    believe is to be irrelevant, prejudicial evidence.  There

13    would be a substantial amount of testimony and documentary

14    evidence that would go towards having to describe the

15    re-organization.  It would be like a trial within a trial.

16    And if you look at their exhibit list, you see that I think

17    fifteen of their sixty-five exhibits are all about Project

18    Park.  So, even they believe that this would result in a trial

19    within a trial.

20          So, Your Honor, for all of those reasons, it's our

21    position that there should be no evidence regarding the

22    Project Park re-organization.

23          MR. DONELON:  I'll try and make it a little more

24    simple.  Project Park, basically, happened after we filed

25    this lawsuit, after this Court granted conditional class

1  certification, after it was fought pretty hard by both sides

2  and you granted conditional class certification.   Allowed

3  notice be sent out.

4         After that occurred, the bank goes in and has

5  existing branch managers now are moved from ABM positions,

6  assistant branch manager positions, to banker positions.

7  They're now being paid overtime.   These documents Ms. Bloom's

8  referring to, a lot of it contains the remaining half of what

9  they did.   What they did is they completely re-wrote the job

10  description to very explicitly state activities that are

11  exempt under the FSLA, things that never existed in the prior

12  to detailed job description.   For these folks, much more

13  detailed on the information, be it subsequent remedial. The

14  case law that we provided has to do with what they're doing is

15  a correction.   Every case law says if you're going to try to

16  kick something out because of a subsequent remedial issue,

17  it's on the basis that the defendant is saying, hey, we're

18  trying to fix this.   Here we are trying to correct a wrong.

19  A remedy.   Don't hold it against us.   That's the whole policy

20  behind that rule.

21         There is a case in here that we cited that,

22  basically -- and in all our, in all the pleadings to the

23  Court, they did the opposite.   From day one, they said not

24  correct.   This has nothing do with fixing a problem.   That is,

25  what we are doing is a complete business decision, unrelated

1   to trying to correcting the problem.  Another thing that's

2   important, Judge, is we've got some folks who are going to

3   come in and testify, who are current employees, or recently,

4   not current, anymore.  But were, they were the ones that came

5   to work one day as an assistant manager and their supervisor

6   called them in, Mr. Patterson is one of them, and said you're

7   being re-classified to banker's position.  And his testimony

8   is going be, okay.  His testimony is going to be about he was

9   told you are doing the exact same thing you've always done,

10  which is what he did.  Our position here is the bank assistant

11  branch manager and banker are the same things.  That's the

12  position of our case.  It's not a subsequent remedial measure.

13  There is no admission by them that this is actually tied to a

14  recommendation.  So, the plausibility of their -- if the

15  feasibility of them is to observe a problem and correct a

16  problem, Project Park shows at least some attempt by the

17  company to take a look at this position and do something about

18  it, at least in the form of re-writing the job description.

19          MS. BLOOM:  If I may respond, Your Honor.  Just to a

20  couple small points.

21          First of all, with regard to any new job

22  description, that's clearly irrelevant to whether or not the

23  people operating under the old job description were performing

24  exempt or non-exempt tasks.

25          I just wanted to talk for a minute for all the

1  witnesses who are going to come in and talk about Project

2  Park.  There's only twenty-eight of the opt-ins who were

3  impacted by Project Park.  And, significantly, Your Honor,

4  on their thirty-three person witness list, the person that

5  Mr. Donelon spoke about is the only person that was impacted

6  by Project Park.  So, to say that all these people are going

7  to come in and talk about it is not exactly accurate.  In

8  fact, I think --

9            MR. DONELON:  That is not relevant, though.

10            MS. BLOOM:  Well, it is relevant.  The other thing

11  that's important to know is that of the opt-in people here,

12  ninety percent of them are former employees who wouldn't have

13  even been impacted at all by Project Park.  So, the Project

14  Park, additionally, we believe it's not relevant.  We believe

15  that it does fall under Rule 407.

16            THE COURT:  What about his argument that there has

17  to be some type of expressed admission that this is why we're

18  doing this?  We are fixing up this problem.

19            MS. BLOOM:  I disagree with that.  I disagree with

20  that.  I think it falls within the purview of what could be

21  construed as a subsequent remedial measure.

22            The whole purpose of Rule 407 is that if a company

23  takes actions to change its policies, regardless of whether or

24  not the company believed that at the time they were doing

25  something wrong, that that should be encouraged as opposed to

1    discouraged.  And I would, I would suggest that the Court take

2    a look at some of the cases that were cited in our brief.   In

3    particular, the Liger versus New Orleans Hornet case, which

4    was a case involving a re-classification, and the Court held

5    that subsequent re-classification was not relevant to the

6    issue of whether or not the plaintiff had been properly

7    classified at the time of the lawsuit.  Same thing with the

8    Mike versus SafeCo Insurance Company case.

9              MR. DONELON:  One case was actually a company that

10   said it Was part of their standard routine practice,

11   religiously, whether it be quarterly, every other year, review

12   all of their employee positions to evaluate whether they're in

13   compliance with the law.  That's not the case here.

14             To point out not many people were affected by

15   Project Park, really, I don't think it's very relevant.

16   There's very few current employee joint class actions where

17   few people step forward and say I worked for you every day.

18   Now, I'm going to be suing you.  Not many current opt-in

19   cases.  You know, the fact is this Project Park, Judge, the

20   person I deposed, I asked him, all these folks who had gotten

21   moved from assistant branch manager to branch manager, how was

22   that pay handled.  His position was we took that salary, just

23   converted it to an hourly rate of pay.  That's  an important

24   comment because that, as I pointed out correctly, yearly, one

25   of the things you look at regarding persons primarily under

1    FSLA is how does their pay compare to the people who you claim

2    whose job they're really doing?  How do those two compare?

3    That is the situation where they converted all salaries.

4              MS. BLOOM:  I think that points out one of the

5    fundamental problems with admitting any evidence about Project

6    Park.  Were Mr. Donelon were to put on evidence of that, we

7    would put on witnesses who would talk about the human resource

8    considerations for why, when you have a re-organization,

9    you're not going to reduce somebody's pay.  What are the

10   reasons behind a decision like that?  That has nothing to do

11   with whether or not when somebody, whether or not any of the

12   four hundred seventy-three people who were functioning as

13   assistant branch managers, what each of those people were

14   doing and whether each of those people were performing

15   managerial tasks.

16             MR. DONELON:  The comment I would make, you've

17   probably heard enough, is if they take any position that the

18   job descriptions, that any of these employees did function and

19   operate under, does in and of themselves prove that they were

20   exempt employees and then they later have a subsequent job

21   description?  That completely, I think, changes the whole ball

22   game on their position by going three or four pages long,

23   spelling out all these management things they can do that

24   didn't exist beforehand.  I think that would certainly open

25   the door for allowing that stuff in evidence.

1          THE COURT:  That's different.  I'm going to grant

2    your motion.  I'll put this in writing with a memorandum.

3    With the Clerk of Court, of course.  Okay.

4          MR. DONELON:  Your Honor, just for clarification,

5    though.  When we go to have the one witness who takes the

6    stand to testify, we showed up for work.  I was instructed I'm

7    going to be a banker.  He should be able to say, by the way,

8    you do the same work I've --

9          MS. BLOOM:  The motion was just granted.  This is --

10          MR. DONELON:  This is not Project Park.  Even if one

11   of our witnesses says, when I worked as a banker, this is what

12   I did.  When I worked as an assistant branch manager, they're

13   identical.  One of them gets paid overtime.  One doesn't.

14   Certainly relevant information.

15          MR. BATTEN:  He can certainly testify about what he

16   does on any given day.  What he can't testify to and what was

17   just covered was, what was covered by our motion, is for him

18   to somehow tie it to Project Park.

19          MR. DONELON:  He is not going to testify I came to

20   work and I was instructed that I was going -- no longer an

21   assistant branch manager.  I was going back to be a banker.

22   Leave it at that.  Fine.  What's changed.  Nothing.

23          THE COURT:  No.  He is probably going say, well,

24   there was a re-organization.

25          MR. DONELON:  We can prepare him ahead of time.

1          THE COURT:  Tell him what he was going to say if he
2     tells the truth.
3          MR. DONELON:  Judge, every other ruling on a motion
4     in limine, sometimes you have to let the witnesses --
5          THE COURT:  I'll think about it.
6          Okay.  Defendant wants to exclude evidence of other
7     lawsuits against defendants as irrelevant.  What other
8     lawsuits are you talking about?
9          MS. BLOOM:  Mr. Donelon and his team, as you have
10    have heard, have a number, a number of these other lawsuits
11    pending against the defendant in other jurisdictions.  I think
12    you knew at one point they had a state law claim here that was
13    subject to a fight in state court in Pennsylvania.  They've
14    got some actions going on up in Illinois.  We just want to
15    insure that they're not going to reference any of those other
16    actions in the context of this trial, because that could be
17    highly prejudicial and make it seem like there is more truth
18    behind the allegations in this case.  And it's completely
19    irrelevant to whether or not the people in this case were or
20    were not properly classified.
21         THE COURT:  Had you planned on introducing evidence
22    of other lawsuits?
23         MR. DONELON:  Unless they kick the door open some
24    way.  We have thirty-five or sixty-seven other cases.  Are
25    certified class actions right now.  But, again, this may have

1    to delve into some of these folks from New York get all in as

2    witnesses.  They're currently part of the class action making

3    the same claim.

4             MR. WINEBRAKE:  Your Honor, in the papers regarding

5    this motion, this was one of the motions where we took the

6    position that it seems like it's premature to rule on it

7    because it could probably be better ruled on in the context

8    of what is actually happening at trial.  There may be

9    circumstances where someone's testimony would open the door.

10            For example there's a good faith defense that's

11   being asserted by the defendants and it's possible that with

12   respect to the good faith defense somebody's testifying about

13   the company's efforts to review the law.  It's, it could

14   possibly become relevant in that context, what other kind of

15   litigation is out there that that person may or may not have

16   known about.

17            I'm not saying, Your Honor, that that's going to

18   happen, but I think, consistent with our written papers, the

19   position we would take is that it's best to just leave that

20   issue to trial.  We certainly don't intend to affirmatively

21   bring up any of the other litigation in opening argument.

22   And, certainly, if we were to do it, we would, we would give

23   everyone advance notice that that's something that we were

24   going to bring up.

25            But plaintiffs are a little bit concerned about a

1  blanket order that would tie our hands at trial if the

2  opportunity were such that it seemed like this stuff should

3  come in.

4          MS. BLOOM:  Your Honor, we would just like a ruling

5  because virtually every time we come to Court Mr. Donelon

6  talks about the other cases.  And one thing I think you should

7  know, the New York case, for example, that was -- yes.  A

8  certification order was issued and the Second Circuit has now

9  accepted review of plan, a review of the entire decision.  No

10  notice has been sent out in that case, but every time that we

11  go to Court in any of these cases they talk about all of the

12  other cases.

13          And so, we would like, we would like an order so

14  that we can be sure that they're not going to get up in

15  opening statement or they're not going to wrap that into

16  questions of their witnesses.  Obviously, if we open the door

17  to that, we open the door to that.  We have to live with that.

18  But unless we open the door to that, we would like to know

19  that that's not going to be admitted in this case.

20          MR. DONELON:  I think we've just kind of agreed to

21  that.

22          THE COURT:  Well, I think the motion's granted to

23  the extent they cannot use that testimony in their case-in-

24  chief.  If something happens, somehow it becomes relevant, I

25  would have to look at it then.  But as it stands right now, I

1   mean, we are -- don't let people get up and say this

2   defendant, who robbed banks in New York, Chicago, and Detroit,

3   previously.

4           Okay.   Exclude testimony of seventy-six non-opt-in

5   ABMs whose testimony refutes the testimony of plaintiff

6   witnesses.   I think I already said that you can bring in some

7   non-opt-ins.

8           MR. DONELON:   But we can also point out they're not

9   part of the class.   Was part of your ruling, too.

10          THE COURT:   Obviously, they're not part of the

11  class.

12          MR. DONELON:   As long as we can ask them that on the

13  stand.

14          MR. WINEBRAKE:   Would Your Honor consider putting

15  into the order the instruction about defense counsel not

16  communicating with those individuals, except through

17  plaintiff's counsel?

18          MR. BATTEN:   We would like an opportunity to brief

19  that because they don't represent these people in this case.

20          THE COURT:   Yes.

21          MR. WINEBRAKE:   I think earlier Your Honor agreed

22  with plaintiff's position, that because all of these ABMs that

23  are non-opt-ins are class  certified --.

24          THE COURT:   Oh, no.   No.   I thought we're talking

25  about in this case.   If you don't represent somebody in any

1    case.

2            MR. WINEBRAKE:  We do represent them in another

3    case.

4            THE COURT:  Do you still have a fiduciary

5    relationship with them?

6            MR. DONELON:  Absolutely.

7            MR. WINEBRAKE:  Your Honor had said earlier that in

8    your view all those --

9            THE COURT:  I thought we were talking about in this

10   case.  This is another question.

11           MR. WINEBRAKE:  Your Honor had said --

12           THE COURT:  Are all seventy-six of these people that

13   you want to call a member of some other class action that they

14   represent?

15           MR. BATTEN:  Not all of them.  A number of them are,

16   but not all.

17           MR. DONELON:  Almost every one.  I think two opted

18   out in Massachusetts and --

19           MR. BATTEN:  Well, there's some from other states --

20           MS. BLOOM:  No notice has gone out in New York --

21           THE COURT:  Time out.  Time out.  Hold on.

22           Well, it's beautiful day here.

23           So, you say you have non-opt-ins who do not, who are

24   not represented by them anywhere?

25           MR. BATTEN:  A few.  There are others who are

1   represented by them in other cases, but not represented in

2   this case.  There is no class in Pennsylvania in any Court.

3   So, they don't represent them here.

4         And, Your Honor, last thing Your Honor had said is,

5   back when we were on this topic, your ruling stands.  We can't

6   contact them, except through counsel, but that you would

7   consider it.  I think it might be worthwhile for to us brief

8   it because it's fairly important to us.

9         THE COURT:  What are you going to ask them?

10        MR. BATTEN:  We want those people to come in, talk

11  about their experience.  And it goes, again, this, these

12  questions of representativeness, whether the fifteen people

13  who plaintiffs want to rely on really do speak to company-wide

14  policies or not.

15        THE COURT:  How many assistant branch managers are

16  there in the system?

17        MR. BATTEN:  Over a thousand.

18        THE COURT:  You can't find a hundred fifty who are

19  not part of their class?

20        MS. BLOOM:  Well, they have certified classes in

21  New York and Massachusetts.  I think just one in New York is

22  up on review.  They haven't sent out notice.  There's nine

23  involved in the case here.  There was notice for opt-in.  Four

24  hundred seventy-three opted in.  The biggest concentration of

25  putative class members are in Pennsylvania, New York, and

1    Massachusetts.  So, the people in New York and Massachusetts,

2    though, that elected not to opt-in here, they may be part

3    of their classes, their state law classes in New York or

4    Massachusetts.  But as I said, particularly, in New York where

5    there's been no notice and the Second Circuit has taken a look

6    at it, we would at least like the opportunity to brief the

7    issue of whether we can.

8              THE COURT:  First of all, clearly, you cannot

9    interview any of their named plaintiffs or their opt-in

10   plaintiffs.

11             MS. BLOOM:  Absolutely not.  Of course, not.

12             MR. BATTEN:  Understand that.

13             THE COURT:  But I guess the question is, are you

14   precluded from interviewing their clients, but only their

15   clients in another context.

16             MS. BLOOM:  Correct.  Affirmatively not be in this

17   case.

18             MR. BATTEN:  Right.

19             MR. DONELON:  But they are our clients in these

20   other cases.  They are class members.  We were appointed by a

21   federal Judge as class counsel.  We represent those people.

22             MS. BLOOM:   The exact same subject matter --

23             THE COURT:  You can send me something.

24             MS. BLOOM:  Thank you, Your Honor.

25             THE COURT:  All right.  Now, you're talking about

1   some type of a bifurcated trial.  What did you have in mind?

2             MR. BATTEN:  I think we're in agreement on that.

3             MR. WINEBRAKE:  We are not in agreement on that,

4   Judge.  There's actually a pretty significant disagreement.

5   Plaintiffs are okay with bifurcation, as long as any witness

6   who has information, as long as the bifurcation order doesn't

7   impact the scope of the testimony provided by witnesses who

8   are both liability and damages witnesses.

9             For example, if opt-in plaintiff Jones is one of our

10  witnesses, we want, when we call her, we want to be able for

11  her to give her fact testimony that's relevant to liability,

12  as well as her fact testimony that's relevant to damages.  We

13  don't want her to have to travel to Pittsburgh twice, once for

14  the damages phase, once or the liability phase.  That's an

15  enormous burden on these plaintiffs.  That seems to be what

16  the defendants have in mind.

17            The other problem, Your Honor, is it seems like

18  defendant's bifurcation motion is saying that, is trying to

19  preclude the parties from putting in, during the liability

20  phase, evidence regarding hours worked and evidence regarding

21  pay rates.  But as we've already touched upon, both of those

22  issues are also issues that are relevant to liability issues.

23  So, it's, there's a lot of overlap between the type of

24  evidence that's relevant to liability and damages.  The only

25  witness in plaintiff's view --

1          THE COURT:  Bifurcating the trial.

2          MR. WINEBRAKE:  I don't know that there is that much

3    benefit to bifurcation, Your Honor.  It would certainly affect

4    at least our expert witness.  It would maybe simplify the jury

5    instructions during the liability phase a little bit.  But as

6    far as economies, there's really not much to be gained in the

7    way of economy by bifurcation because so many of the witnesses

8    that are going to appear in the liability phase are going to

9    be giving overlapping testimony.

10         And as we emphasized in our papers, it's just

11   contrary to the whole public policy behind the collective

12   action mechanism to require these opt-in plaintiffs to have to

13   go through the burdens of traveling to Pittsburgh twice.  Many

14   of them, as you know, live all over the country and we're very

15   concerned about that, Your Honor.

16         MS. BLOOM:  We have, absolutely, not only do we have

17   no objection, but we completely agree that they need to

18   testify about their hours worked, to that part of your prima

19   facie case, and their pay rates.  I think our bifurcation

20   motion is really focused on the -- your expert witness.  We do

21   think that it makes some sense to consider the experts, if and

22   when there is a liability finding, because the expert piece,

23   at least my experience has been, it is confusing for the jury.

24   It mixes up the flow of the trial.  But we have absolutely no

25   objection and, in fact, expect that they would testify about

1    their hours, pay rates.

2         MR. WINEBRAKE:   In that event, I think that the way

3    that plaintiff's proposed order is drafted is probably more

4    true to that position than the way in which defendant's

5    proposed order is drafted.

6         MS. BLOOM:   I haven't looked at their proposed

7    order in a while.   But as far as we're concerned, in terms of

8    bifurcation, the thing that we would like bifurcated is their

9    expert witness.   To the extent our expert is a rebuttal to

10   theirs, that portion of her testimony, we would bring her back

11   to do the rebuttal piece.

12        THE COURT:   Sounds right.   Did you have anybody

13   who's going to testify on damages, other than your expert,

14   who is not going to testify during liability, that is, or are

15   we just saying any witnesses that you are going to present on

16   damages is the expert.

17        MR. DONELON:   That's correct.

18        MR. WINEBRAKE:   Right.

19        THE COURT:   You just have your expert.

20        MS. BLOOM:   We have some other witnesses that we

21   would potentially call also on the damage piece of it.   But if

22   it means bringing them back twice, we will.

23        THE COURT:   Be careful.   Also means bring the jury

24   back twice.

25        MS. BLOOM:   I am very conscious of that and,

1   obviously, would not in any way inconvenience the jury.  There

2   may be that some of our witnesses have information that's

3   focused on the actual hours that the plaintiffs worked, or any

4   of the people that testified worked, and/or the representative

5   nature of the testimony.

6           THE COURT:  We're going to talk about how long this

7   trial is going to take in a minute.

8           All right.  Defendant wants to exclude evidence of

9   witnesses' trial testimony that was not properly timely

10  identified in pretrial statement.

11          MS. BLOOM:  I think they've cured that at this

12  point.

13          THE COURT:  Okay.  Defendants request an order,

14  providing liability, if liability is established, overtime

15  payments due should be calculated at a one-half of plaintiff's

16  regular rate of pay or in accordance with half-time or

17  fluctuating work-week when computing overtime.

18          MR. BATTEN:  This is a motion, Judge, that, like the

19  Daubert thing, could wait for a damages phase.  If you prefer,

20  if you want to decide it now, all I would say about it is that

21  this exact issue has come before five different Circuits, the

22  First, Fourth the Seventh, Eighth, and the Tenth, and every

23  single one of them has said the fluctuating work-week method

24  is how you do it.

25          Plaintiffs want to say, well, maybe, that's maybe

1    the underlying agreement between the parties that has to exist

2    in order for that to apply as a fact issue.  But there's no

3    argument from them that anybody understood that an ABM was

4    going to be paid any extra for extra hours.  So, the factual

5    predicate is not really contested.

6              THE COURT:  All right.  We'll hold off.  This may be

7    a jury issue.

8              MR. DONELON:  Well, Your Honor, part of it is, and

9    maybe there may be a, an argument to the jury and the jury

10   will make a decision.  Judge Conti just issued a thorough

11   opinion on how it should be possibly addressed.  It was the

12   jury decided what was the understanding between the parties,

13   initially, regarding how many hours were expected to be worked

14   per week.

15             THE COURT:  She's smarter than me.  She knows this

16   stuff.

17             MR. DONELON:  She wrote a thorough opinion on it.

18   So, I mean, that stuff, to say it can be deferred until the

19   damages phase may not be quite accurate because it may be a

20   factual question the jury may have to answer.  We might have

21   to put on evidence what was the understanding when we put our

22   folks up on the stand.  Well, what was their understanding.

23   Their corporate representative testified that it was expected

24   that this was a forty-hour-a-week job.  And if that's how you

25   determine how you make a salary, you divide the salary divided

by what was expected when the job was taken regarding hours.

That's how you do the hourly rate.  Anything after that, time

and a half.

        THE COURT:  Any Citizens bank employees have a

union?

        MR. BATTEN:  No.  Certainly not as relevant here,

anyway.  But I don't think at all.

        THE COURT:  Okay.  Realistically, how long do you

think it will take your case to come in?

        MR. DONELON:  Judge, you had set aside three weeks.

We sat down with Mike, went through it all.  A lot of it's

going to depend, and we would make, encourage the Court to set

some sort of time parameters on witnesses.  Only reason we ask

you that is, as you know, we've got in a sense, right now, the

Court has set aside eleven days of trial work.  First day will

probably be consumed with voir dire, openings.  If need be,

we'll have a plaintiff here to start.  I don't know if we'll

get that person on or not.  But dividing the time equally

between the parties, that would, roughly, be five days apiece.

We are hoping to be able to call between two to four witnesses

a day.  One thing we don't know, as you know, we've got people

flying in from all over the country.  Corporate travel making

all the arrangements for these people.  If I were to put on a

witness, say, take an hour with me on direct.  But if it takes

an unlimited amount on the cross-examination, this isn't going

1   to work.  So, I guess with parameters put on this, it's going

2   to mess our entire logistics of getting people in and/or out

3   of here for the trial.

4           So, optimistically speaking, the Court, I guess,

5   needs to give us some guidance on what the Court believes is

6   going to be a sufficient number of branch managers to call.

7   We have put thirty on our list.  We think within the five days

8   that are given us for trial work, we will probably be able to

9   get on anywhere between ten or fifteen of those people.  If

10  they, in turn, also call some assistant branch managers, then

11  you're looking at testimony of whether some is enough.  And

12  the case law that we've cited to the Court in the past shows

13  that that is certainly an acceptable amount to testify on

14  behalf of it.  The biggest thing, like I mentioned, we have

15  got folks coming in from all over the country that are flying

16  in.  We understand that there's no precise time.  The

17  attorneys have tried a lot cases.  Like herding cats sometimes

18  with witnesses.  I do understand that.  But at the same time,

19  it would be helpful if we had some knowledge that if I called

20  somebody and said, look, we're going to need you on Tuesday,

21  maybe Wednesday, that there's something to prevent it from

22  actually being on Friday is what I am getting at.

23          Only way is to set some sort of help for us in this

24  area is to get some parameters.  I know a lot of federal

25  Judges do this.  I'm not sure whether this Court has or not.

1   At least from reading your rulings, you seem to be fairly

2   liberal.

3                   THE COURT:  Liberal?  All right.  What do you say?

4                   MR. BATTEN:  Well, first of all, Your Honor, my

5   recollection of the last conference was that plaintiffs were

6   saying they thought they could get this case completed in

7   three weeks.  And I said I thought it would be more like six

8   weeks.  And I have not seen an order that says there's only

9   three weeks on the trial calendar.

10                  We cannot try this case in three weeks.  We have a

11  hundred thirty-seven witnesses on our list.  We're not going

12  to call one hundred thirty-seven.  Don't worry.  That's not

13  going to happen.  But we may have sixty or seventy witnesses.

14  They're all going to be quite short.  I expect direct and

15  cross would be an hour.  But that still just is going to take

16  some time to get through those people.

17                  THE COURT:  Who are you calling?

18                  MR. BATTEN:  Well, it's several categories, Your

19  Honor.  Something we've talked about today, some of them are

20  other assistant branch managers who didn't opt into the case

21  and have a different experience than the testifying

22  plaintiffs.  Some of it is branch managers and regional

23  managers who are not the plaintiffs and are going to rebut

24  their own testimony, what they actually did day-to-day.  Some

25  of them are branch managers who will speak to other opt-ins.

1  I mean, other ABMs who are not opt-ins.  All in search of

2  trying to get a picture of whether the plaintiff's allegations

3  is a company-wide practice, they've done the same thing every

4  day and none of it is managerial, is accurate or not.  So, it

5  breaks down into several different groups.  We want to call

6  some people from each of those kinds of categories to try to

7  give the jury a full picture of exactly what working at

8  Citizens as an ABM is like, again, because the plaintiff's

9  witnesses we think are carefully selected to present a certain

10 view of how the job operates.

11        THE COURT:  No.  They were carefully selected?

12 Dastardly.  Dastardly.

13        MR. BATTEN:  There are a lot.

14        MR. DONELON:  I just remember when we met, you asked

15 me how much time at the last conference.  I said, Judge, we

16 think four weeks.  You laughed.  Said, you don't know me very

17 well.  Judge, I'll do it in two weeks if we limit the number

18 of witnesses.  As far as I'm concerned, you don't need to have

19 twenty, thirty ABMs to testify.  We'll put on as many as the

20 Court likes.  Then it was concluded that we found a date.  It

21 was three weeks.  We sat down, counted out dates, because

22 there's a holiday involved.  You don't do work on Fridays.  We

23 sat here with Michael and counted out the days.  We had three

24 weeks.  We think that's sufficient.

25        MR. BATTEN:  The core of our defense, Your Honor,

1    requires that we be able to call quite a number of people.

2    The number of witnesses itself is an irrelevant issue as

3    opposed to just their testimony.  They're not going to be

4    cumulative.  I'm very sensitive to that issue.  They're all

5    going to be talking about their unique experiences.

6             You've said, since you filed the complaint in this

7    case, these are company-wide procedures that affect everybody

8    the same way.  That is the core of the plaintiff's case.  And

9    it is the fact that we need to knock down.  The way we have to

10   do that is by presenting the jury with a broad enough swath

11   that they get a sense.  If they call ten and we call ten,

12   that's a very different trial, a very different inference,

13   about representativeness than if we call ten and they call

14   fifty.  It's the core of our defense.  We'll be as brief and

15   non-cumulative as we can, but we need to be able to do that.

16            MS. BLOOM:  We take issue take with the fact that in

17   the nine states and a thousand branches and trying rely on a

18   handful of people and saying from this handful of people this

19   is representative about what all the people in these nine

20   states and these thousand branches did on day-to-day basis.

21   That's just untrue, Judge, --

22            MR. DONELON:  That's not what --

23            THE COURT:  Hold on.  She can only take one at at

24   time.  She's good, but she can only take down one at a time.

25            MR. DONELON:  It's not about all these people.  It's

1   about the four hundred seventy people in this case.  We're

2   going to put on all this testimony.  Are you one of the four

3   hundred seventy people?   Okay.  Now, in closing argument,

4   I'm going to say to the jury, we are here for about four

5   hundred seventy people.  They've talked a hundred, two hundred

6   other people.  We're here to talk about these four hundred

7   seventy people.  There's been no evidence to rebut.

8           MR. BATTEN:  We will have saw and heard from four

9   hundred fifty --

10          MR. DONELON:  That's not what's been --

11          MR. BATTEN:  What's been said to the Court in this

12  hearing today is that we have an opportunity to show that the

13  inference from ten to four hundred seventy is not a good

14  inference.  The way we do that is by bringing in other people

15  to show that the testimony is not representative.

16          MR. DONELON:  I don't think that's, maybe I am

17  mistaken, but at some point, Judge, we're going to need to

18  know what's going to be the sufficient representative number.

19  I mean, all these cases that are tried, that we briefed the

20  Court on the Family Dollar, fifteen people came in, testified

21  on behalf of two thousand.

22          THE COURT:  Cases go on and on with numbers like

23  that.

24          MR. DONELON:  And they were all upheld on appeal.

25          THE COURT:  All right.  Well, I'll allocate sixteen

1    trial days for this case.  How I do it, you each get eight.

2    You'll be on the clock.  Meaning, you get eight days of

3    testimony, from 9:30 to 4:30.  How you use your time is up to

4    you.  You can use it, you can take opening statement for a

5    day.  Closing statement for a day.  You can use it on direct.

6    You can use it on cross.  Again, but when your time is up,

7    it's up.  So, you're going to have to focus your time because,

8    if your time is up, you don't get a closing statement.  You

9    understand?  When your time is up, it is up.

10          I'm going to say that a lot of times because, just

11   to make sure you understand this, because a lot of times

12   people will come in here thinking, well, you know what?  We'll

13   cry at the end of the trial.  Judge, you got to let me put in

14   two more witnesses.  Well, no, I don't.  When your time is up,

15   it's up.

16          Now, the sixteen days again, we are not going to

17   take testimony on Fridays.

18          MR. DONELON:  I think we got one federal holiday in

19   there, too, if I remember right.

20          THE COURT:  Well, maybe.  Martin Luther King Day.

21          MR. WINEBRAKE:  Voir dire, things of that nature,

22   that wouldn't count on plaintiff's first day; would it?

23          THE COURT:  What wouldn't count?

24          MR. WINEBRAKE:  First day we do voir dire?

25          THE COURT:  No.  No.  I'm not going to take time

1    away from picking a jury.  That's both sides.  But opening

2    statements are a part of the trial.  I will not count

3    9:00 a.m. meetings.  I count side-bars.  If you ask for a

4    side-bar, that comes off your time.

5         MR. DONELON:  In essence, so, we can do the math.

6    I guess you probably don't count the morning break, afternoon

7    break?

8         THE COURT:  We actually do figure that out.  No.

9    It's Court time.

10        MR. PALUS:  Yes.

11        THE COURT:  Do we have anything else during that

12   time, Mike?

13        MR. PALUS:  We have a criminal trial scheduled to

14   begin January 14, Judge.

15        THE COURT:  There's going be a break, then.  A

16   substantial break.

17        MR. PALUS:  Yes.

18        THE COURT:  I'm going to be out of country.

19        MR. BATTEN:  From when to when?

20        THE COURT:  I think the last week in January; isn't

21   it?

22        MR. PALUS:  Yes.

23        THE COURT:  And I cannot get out of it.

24        MR. DONELON:  Because there was three weeks in

25   January that were set aside.

1            THE COURT:  Last week, I'll be out of the country.

2            MR. BATTEN:  If we started first thing in February,

3    would that give us a block after Your Honor returns?

4            MR. PALUS:  We have criminal trial.

5            THE COURT:  Which one?

6            MR. PALUS:  Gerideau-Williams, the one you just

7    signed.

8            THE COURT:  Re-scheduling time when?

9            MR. PALUS:  Middle of February.

10           THE COURT:  If we move it into March, it's going to

11   be disjointed.  I have a judicial conference, which means I'm

12   in D.C.  April, I'm at the Chief Judges Conference.

13           MR. DONELON:  Let's make this a two-week trial.

14           THE COURT:  No.  We could pick the jury in January.

15   Tell them to come back, cut off one day.  All right.  Let's

16   just stick with Michael and go with the dates.

17           MR. WINEBRAKE:  Your Honor, I think if, especially

18   if the trial is going get pushed back further into the year,

19   it might make sense, this Daubert probably could happen ahead

20   of time, so we don't get a session where the jury is going

21   have to be out for a day or two and then come back for the

22   damages phase.

23           THE COURT:  That's a good idea.

24           MR. BATTEN:  That's fine.

25           MS. BLOOM:  That's fine with us.  We have no

1   objection.

2           THE COURT:  Okay.

3           MS. BLOOM:  Work with Mike on that.

4           MR. BATTEN:  I would be doing my client a disservice

5   if I didn't ask you for more than sixteen trial days.

6           THE COURT:  You did your client a service, but I --

7           MR. BATTEN:  Thank you.

8           THE COURT:  You can see how much problem I have

9   putting it in, now.

10          MR. BATTEN:  I understand.  I guess my hope was

11  there would be a bigger block.  But I understand Your Honor's

12  ruling.

13          THE COURT:  We got a nice bunch of time in 2016,

14  I think.

15          Now, I'll go through some of this stuff now so you

16  can prepare to know what going to happen.  I don't know if I

17  went over this stuff with you before, but we meet every day at

18  9:00 a.m.  What I do at 9:00 a.m. is I go over what's going to

19  happen.  Get routine offers of proof.  Anything you know is an

20  evidentiary problem, you know is going to come up, tell me

21  then because, then, if I have the time to rule on it, if I can

22  rule on it, I'll rule on it.  Then, if not, I'll at least have

23  time to think about it.  If you want well thought-out

24  decisions, give me time to think about them.

25          We try to get in the courtroom at 9:30, sharp.  Put

1    anything, grease my skids, tell me at 9:00 a.m.  If I've made

2    a ruling the day before and you want to put a proffer on the

3    record for appellate review, tell me the following day at

4    9:00 a.m. and I will let you have time to put your offer on

5    the record.  I do not have side-bar conferences as to things

6    like that.

7            All your exhibits should be marked before you get

8    here.  I don't care if your first exhibit is No. 196, but they

9    all should be marked before you get here.  If the exhibits are

10   not going to be objected to, we'll introduce them here in

11   chambers without taking up time in the courtroom.  In the

12   courtroom, we don't have to make a written ruling.  Your

13   Honor, I move Exhibit No. 197.  If we admit it in chambers,

14   it's admitted.  Just use it.  If something's going to be

15   objected to, object to it here, not in the courtroom.

16           If you're examining the witness, please remain at

17   the lectern.  I don't allow dancing around the courtroom.  If

18   you have something you want to show the witness, it can't be

19   used on the ELMO?  Your Honor, may I approach the witness.

20   Yes.  If it's going to be a short colloquy, I'll let you do it

21   from the witness box.  If longer than that, you'll have to go

22   back.

23           MR. BATTEN:  That's direct and cross from the

24   lectern?

25           THE COURT:  Direct and cross from the lectern.  And

1    the thing is I know sometimes it seems like I know people talk

2    about me being too formal in the courtroom, but in all candor

3    I'm trying to listen.  I'm taking notes.  I find it

4    distracting to have lawyers walking around the courtroom.

5    It's distracting to me, to the court reporter.  And she's

6    trying to look at the witness and the witness can't hear you

7    because you're not facing them.  Very practical aspect to

8    that.

9            We don't play tag team.  Whoever conducts a direct

10   examination of a witness will protect the witness on cross.

11   Same thing on the other side.  If you're going to object to a

12   question, we've not dealt with it here, please rise.

13   Objected.  Asked and answered.  Objection.  Hearsay.

14   Objection.  Beyond the scope of direct.  If you stand up and

15   say, Your Honor, I have been quite patient with counsel's

16   flagrant disregard of the most basic Rules of Evidence, at

17   this particular juncture I'm going to cut you off.  I'm going

18   to say, what is the legal basis of the objection.  If you

19   don't come out with a word that's in the Rules of Evidence,

20   I'm going to cut you off and objection overruled on that basis

21   alone.  Okay?  I'm just telling you so you know.

22           I like counsel to meet at the end of the day.  We

23   usually knock off about 4:30, but I like counsel to meet at

24   the end of the day and go over each other's what are you going

25   to do, exhibits, what exhibits are you going to use, who are

1   you going to call.  I would like the 9:00 a.m. conference to

2   go a little bit easier; okay?

3           Except for the one ruling, the transcript will serve

4   as the opinion of Court on all my rulings.  But the one I'm

5   going to put something on the record right now.

6           MR. BATTEN:  May I ask, Your Honor, about openings

7   and closings?  Can we stand?

8           THE COURT:  Yes.  There will be a lectern over there

9   right in front of the jury box.  We have another lectern in

10  the courtroom for that purpose.

11          MR. BATTEN:  We should be at the lectern?

12          THE COURT:  You should be at the lectern.  If you

13  have, say, some demonstratives that you want to use, I'll let

14  you do that.  That's not a problem.  But you're simply going

15  to give a straightforward opening statement.  There could be a

16  lectern in front the jury box.  It will be there for that

17  purpose and then we'll take the down.

18          If you don't know how to use the ELMO, learn between

19  now and then.

20          MR. DONELON:  Does your ELMO project to a t.v.

21  screen or large --?

22          THE COURT:  Go into the courtroom before you leave.

23  Look around.  We have monitors with individual monitors at the

24  tables.  I have one.  My Courtroom deputy has one.  Clerk has

25  one.  All four of the counsel table have one.  And there is a

1  monitor for every other juror in the jury box.  So, you don't

2  have to worry about placement or anything like that.

3          If you're going to have electronic devices in the

4  courtroom?  Have a worker there, a technician.

5          MS. BLOOM:  We're hoping to able to have a laptop.

6  Have somebody help us use it.

7          THE COURT:  Okay.  Well, before we get to the trial,

8  call Mr. Palus and tell him someone's coming in with all this

9  stuff so he can alert the Marshals.  They're very peculiar

10  about this.

11          I don't have too many more rules than those.  One

12  thing that I've always found helpful and I tell people this.

13  I haven't lost a case since I got this job.  But one technique

14  that I think you overlook all the time, particularly, if

15  you're going to have a lot of witnesses over an extended

16  period of time, then you give your closing statement.  You

17  say, you remember Joe Smith?  He said.  And they don't

18  remember Joe Smith.  Take Joe's picture, put it on a disk,

19  and put it up there when you're talking about what Joe Smith

20  said, because they're not going to remember that.

21          Same thing is true of exhibits.  That's why you have

22  the ELMO.  That's why we have it available and so on.

23          So, any questions of me as to procedures?

24          MR. DONELON:  Just voir dire?  If you can maybe give

25  us a little more description on that?

 1              THE COURT:  Michael Palus does it.  You can submit
 2    questions.  Like I said, you can submit questions, but Michael
 3    does it.  I'm not even in the courtroom.
 4              MS. BLOOM:  Should we ask him if, if he puts them in
 5    the box, if you can strike back or not?
 6              THE COURT:  We've done this before.
 7              MS. BLOOM:  Right.  I figured I just -- everybody
 8    does it differently.  So, I just like to know.
 9              THE COURT:  We'll have written instructions for you.
10              MS. BLOOM:  Okay.  Great.  Thank you.  And, Your
11    Honor, on how to handle voir dire, I was wondering, for cause
12    strikes, if the Judge wasn't in the courtroom, how that would
13    be handled.
14              THE COURT:  Anything else?
15              MS. BLOOM:  I don't think so.
16              THE COURT:  Okay.  Question?
17              MR. WINEBRAKE:  Your Honor, can I raise one issue?
18    One thing that we're really concerned about, I know this is
19    not happening January 14, anymore, but with respect to the
20    opt-in plaintiffs who are on the Defendant's Exhibit list, but
21    not on ours?  That are on the defendant's witness list, but
22    not on ours?  We have been really concerned about just the
23    logistics of bringing them into Pittsburgh to testify.  The
24    plaintiffs would really appreciate it if sometime, maybe a
25    month or so in advance of trial, if we can get a commitment

1    from the defense counsel as to they have got a hundred fifty

2    witnesses on their list.  Are they really going to call these

3    opt-in plaintiffs?  And, if so, when are those people going to

4    testify, because we have to fly them in.  They have jobs and

5    we can't just have them coming down here, sitting around for a

6    week, waiting for defense counsel to pick them.

7            So, if there could be some protocols to be put in

8    place for that, I think that would be fair to the opt-in

9    plaintiffs.  I think it would make everything go a lot more

10   smoothly.

11           My concern is we're causing a lot of distress to

12   these plaintiffs and, for all we know, the defendant may never

13   call them.  And that's -- we, certainly, don't want to have to

14   fly in people who aren't going be called.

15           MS. BLOOM:  You know what would be really helpful in

16   that regard is if we knew exactly who you were going to call.

17   If we could have a better idea.  I'm sure you're not going to

18   call all thirty-three people.  Frankly, we, certainly, don't

19   want to inconvenience any of the opt-ins.  We would love to

20   work with you on that, but what would make that process go a

21   lot smoother would be if you let us know who you are really

22   going to call because that will impact the opt-ins.

23           MR. WINEBRAKE:  We're willing to do so to a degree.

24   We're not, unilaterally, going to tell you who our specific

25   witnesses are while we're still looking at a hundred fifty

1    person witness list.  That's not fair.

2         THE COURT:  Okay.  Thank you.

3         (Whereupon, the in-chambers conference was concluded

4    on the fourteenth day of December, 2012.)

5                        - - -

6              C E R T I F I C A T E

7                        - - -

8         I certify by my original signature herein that the

9    foregoing is a correct transcript from the record of

10   proceedings in the above-entitled matter.

11

12

13                    s/Sandra Wenger, FCRR, CM
                      Official Court Reporter

14                    DATED: January 10, 2013

15

16        *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

17

18

19

20

21

22

23

24

25